Christopher A. Turtzo; NV Bar No. 10253
**MORRIS, SULLIVAN & LEMKUL, LLP**
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Tel: (702) 405-8100
Fax: (702) 405-8101
Email: turtzo@morrissullivanlaw.com

Patrick Coughlin (*pro hac vice* forthcoming)
Carmen Medici (*pro hac vice* forthcoming)
Fatima Brizuela (*pro hac vice* forthcoming)
Daniel J. Brockwell (*pro hac vice* forth coming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com

[Additional attorneys listed on signature page.]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL ROSENBAUM; RENELDO RODRIGUEZ; and THOMAS CARON, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1  Plaintiffs Daniel Rosenbaum, Reneldo Rodriguez, and Thomas Caron, individually and on

2  behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as

3  to the facts pertaining to themselves and upon information and belief as to all other matters, and

4  based on the investigation of counsel, brings this class action complaint to recover treble damages,

5  injunctive relief, and/or other relief as appropriate, based on violations of the Sherman Act and

6  numerous state antitrust and consumer protection laws by Permian Resources Corporation f/k/a

7  Centennial Resource Development, Inc.; Chesapeake Energy Corporation; Continental Resources

8  Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum

9  Corporation; and Pioneer Natural Resources Company (collectively "Defendants").

## I.      NATURE OF ACTION

1.      This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the effect of fixing, raising, and maintaining the price of retail gasoline (gasoline purchased by consumers at gas stations) in and throughout the United States of America.[1]

2.      Shale oil, also called "tight oil," is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the U.S.

3.      Shale oil is produced by fracturing the rock formations that contain the layers of oil in a process known as hydraulic fracturing, or "fracking."  Today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.[2]

---

[1]      Throughout this complaint, references to "gasoline" are to retail gasoline, including but not limited to all grades and formulations sold to individual end-users at retail gasoline stations throughout the U.S.

[2]      "The U.S. Energy Information Administration (EIA) estimates that in 2022, about 2.84 billion barrels (or about 7.79 million barrels per day) of crude oil were produced directly from tight-oil resources in the United States.  This was equal to about 66% of total U.S. crude oil production in 2022." *How Much Shale (Tight) Oil is Produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6. Crude oil supply is measured by the number of "barrels" produced, each of which contains 42 gallons of crude oil.  Daily oil production is measured in barrels per day, which is at times abbreviated as bpd, but is also b/d or B/D.  Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

2

4.      Shale oil, along with other crude oil, is sold to refineries.  Refineries co-mingle shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods, then refine the crude oil into gasoline and other petroleum-based products. Crude oil is the primary upstream input in gasoline.

5.      The resulting gasoline is then transported to storage terminals, where it is stored and blended prior to sale to gas stations for onward sale to members of the class.

6.      Gasoline is a critical commodity for American consumers.  Approximately 40 million Americans fill up their vehicles every day at American gas stations.[3]  Gasoline purchases account for approximately 5% of U.S. consumer household spending per year, with the average car consuming approximately 500 gallons of gasoline each year.[4]

7.      U.S. independent shale producers ("Independents") are companies that primarily focus on the exploration, development, and production of domestic shale resources.  These companies are distinct from large vertically integrated energy companies, like Chevron and ExxonMobil (known as "supermajor(s)"), with diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources.  For example, in 2019, only 7% of Chevron's total global crude oil produced was from U.S. shale operations.[5]

8.      Defendants Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Pioneer

---

[3]      *Factors that impact gas prices*, NACS (Apr. 05, 2023), https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon.

[4]      Jeff Lenard, *Who Makes Money Selling Gas?*, NACS (Nov. 12, 2021), https://www.convenience.org/Media/conveniencecorner/Who-Makes-Money-Selling-Gas.

[5]      *Chevron to boost Permian oil production as demand for reliable energy grows*, Chevron Newsroom (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows (Chevron produced 220,000 barrels of U.S. shale oil per day in 2019); *2019 supplement to the annual report*, CHEVRON CORP. (2020), https://www.chevron.com/-/media/shared-media/documents/annual-report-supplement-2019.pdf, at 11 (Chevron's total 2019 production was 3,058,000 barrels of oil equivalents per day).

3

Natural Resources Company ("Pioneer"), collectively "Defendants," are among the largest Independents.  Independents traditionally acted as "swing producers" for the global oil market, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.

9.      The U.S. experienced record-high crude oil prices beginning on or around January 2021, continuing through the present.  Basic principles of supply and demand dictate that in their role as swing producers, Defendants should have increased production to capitalize on this price rise.  Instead, Defendants collectively decided not to increase their U.S. shale oil production.

10.      Defendants' agreement is complimented by their cooperation and collusion with the Organization of the Petroleum Exporting Countries ("OPEC"), the international cartel of large oil producing nations, who also sought to raise oil prices through managing oil production during this period.

11.      Between 2017 and 2023, Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output in response to market conditions. Following these meetings, representatives from Defendants consistently made public statements confirming these discussions and the exchange of confidential information.  Specifically, Defendants also confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets.  Likewise, when publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants.

12.      From the time when the meetings between U.S. shale producers and OPEC began in 2017 until the onset of the COVID-19 pandemic, worldwide oil prices and supply remained relatively stable.  In the early days of the COVID-19 pandemic, gasoline demand dropped precipitously, sending a shock through the oil supply chain.

13.      Gasoline demand, and thereby oil prices, recovered and ultimately began increasing at a rapid rate in 2021.  The increase in the price of crude oil following COVID-19 was exacerbated by the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market.  This extended run of historically high

1    crude oil prices provided prime market conditions for agile swing producers like Defendants –
2    whose breakeven prices have never been lower and who operate in regions with a wealth of
3    profitable opportunities – to aggressively increase production.

4        14.    But Defendants did not take advantage of this market opportunity.   Rather,
5    departing from their historical practice and rational independent self-interest, each Defendant
6    limited their domestic shale production growth.

7        15.    Defendants' agreement to limit their respective shale production volumes has had
8    the effect of fixing and/or stabilizing at an artificially high-level U.S. (and global) crude oil prices,
9    which in turn fixed and/or stabilized retail gasoline prices in the United States at an artificially
10   high level.

11       16.    Defendants' cartel is a *per se* unlawful restraint of trade under numerous state
12   antitrust and competition laws.   Plaintiffs and the Classes suffered substantial harm from the
13   supracompetitive prices they paid for retail gasoline for personal use as a direct and proximate
14   result of the cartel to constrain domestic production of shale oil in the United States.   They bring
15   this suit to recover that loss.

16   **II.    PARTIES**

17       17.    Plaintiff Daniel Rosenbaum is a citizen of Nevada and resides in Las Vegas.
18   Mr. Rosenbaum purchased retail gasoline on approximately a weekly basis in Nevada during the
19   Class Period for personal use.   Mr. Rosenbaum has paid higher retail gas prices by reason of the
20   allegations alleged herein.

21       18.    Plaintiff Reneldo Rodriguez is a citizen of Hawaii and resides in the city of Paauilo.
22   Mr. Rodriguez purchased retail gasoline on approximately a weekly basis in Hawaii during the
23   Class Period for personal use.   Mr. Rodriguez has paid higher retail gas prices by reason of the
24   allegations alleged herein.

25       19.    Plaintiff Thomas Caron is a citizen of Maine and resides in the town of Cornish.
26   Mr. Caron purchased retail gasoline on approximately a weekly basis in Maine during the Class
27   Period for personal use.   Mr. Caron has paid higher retail gas prices by reason of the allegations
28   alleged herein.

20.     Defendant Permian Resources Corporation, known as Centennial Resource Development ("Centennial") during the relevant period, is a Delaware Corporation headquartered in Midland, Texas.  Centennial's common stock is listed and traded on the New York Stock Exchange under the trading symbol PR.  Centennial is an oil and gas production company that acquires and processes shale oil in Texas and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

21.     Defendant Chesapeake Energy Corporation ("Chesapeake") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma.  Chesapeake's common stock and warrants to purchase common stock trade on the Nasdaq Stock Market under the trading symbols CHK, CHKEW, CHKEZ, and CHKEL.  Chesapeake is an oil and gas production company that acquires and processes shale oil in Louisiana and Pennsylvania, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

22.     Defendant Continental Resources Inc. ("Continental") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma.  Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm, on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc.  Continental is an oil and gas company that acquires and processes shale oil in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

23.     Defendant Diamondback Energy, Inc. ("Diamondback") is a Delaware Corporation headquartered in Midland, Texas.  Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG.  Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

24.     Defendant EOG Resources, Inc. ("EOG") is a Delaware Corporation headquartered in Houston, Texas.  EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG.  EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New

York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

25.     Defendant Hess Corporation ("Hess") is a Delaware Corporation headquartered in New York, New York.  Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES.  Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.  Hess also sells the refined consumer gasoline across the United States.

26.     Defendant Occidental Petroleum Corporation ("Occidental") is a Delaware Corporation headquartered in Houston, Texas.  Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively.  Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

27.     Defendant Pioneer Natural Resources Company ("Pioneer") is a Delaware Corporation headquartered in Irving, Texas.  Pioneer's common stock is listed and traded on the New York Stock Exchange under the trading symbol PDX.  Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

28.     Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

29.     Where Plaintiffs ascribe an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

30.     "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

31.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

32.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct.  Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.  The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil prices.

33.     Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## III.     JURISDICTION, VENUE, AND COMMERCE

34.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 16 of the Clayton Act (15 U.S.C. §26), as well as the antitrust, fair competition, and consumer protection laws of various states.  This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

35.     This Court has subject matter jurisdiction over Plaintiffs' claim under Section 16 of the Clayton Act, 15 U.S.C. §26, and under 28 U.S.C. §§1331, 1333(d), 1337(a), and 1367.

36.     This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiff Rosenbaum, a resident of Nevada, is a citizen of a state different from Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in Oklahoma, Texas, or New York.

37.     This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1411-12 (9th Cir. 1989).

38.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States.  Defendants' products and services are sold in the flow of interstate commerce.

39.     By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed class members.  Defendants, directly and through their agents, engaged in activities affecting all states.

40.     Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the Class.

## IV.     FACTUAL ALLEGATIONS

### A.     Organization of the Petroleum Exporting Countries ("OPEC")

41.     OPEC, an intergovernmental organization made up of nations who purport to benefit from sovereign immunity to the Sherman Act,[6] controls close to 40% of the world's oil production.  Historically, OPEC exerted market power over global oil prices through coordinating its members' respective production levels.[7]  Non-member nations historically keyed their oil

---

[6]     Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, I.A.E.E. ENERGY FORUM, Vol. 28, Issn 1944-3188 (Feb. 2019), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf, at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets . . . .'  The organization is also a significant provider of information about the international oil market.  The current OPEC members are Algeria, Angola, Ecuador, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, the Republic of Congo, Saudi Arabia (the *de facto* leader), UAE and Venezuela.").

[7]     Anshu Siripurapu & Andrew Chatzky, *OPEC in a Changing World,* COUNCIL ON FOREIGN RELS. (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

production levels off OPEC guidance to benefit from the oil prices targeted by OPEC; a classic "umbrella pricing" situation.[8]

42.     Historically, Saudi Arabia acted as OPEC's (and thereby the global) swing producer – producers known for their ability to adjust production levels relatively rapidly in response to changes in market conditions and influence crude oil prices – leveraging its status as the member with the largest production capacity to become OPEC's de facto leader.[9]

43.     In December 2016 OPEC expanded its cartel, signing the first of several agreements with 10 other oil-producing nations (most notably Russia, whose production rivaled that of Saudi Arabia), forming what is now known as "OPEC+."[10]

44.     This long-resisted expansion of OPEC was done out of necessity[11] – by 2014, OPEC had lost its ability to exert complete control over global oil prices, thanks to the arrival of a new global oil player: Cowboyistan.

**B.     "Cowboyistan" Establishes a "New Oil Order"**

45.     Fracking changed everything.  Equal parts controversial and successful upon its introduction in the early 2000's, within eight years of the first commercial shale operation coming

---

[8]     Salameh, *supra* n.6 ("In the 1980s, OPEC began setting production quotas for its member nations; generally, when the quotas are reduced, oil prices increase. . . .  Since the 1980s, representatives from Egypt, Mexico, Norway, Oman, and Russia and other oil-exporting nations have attended many OPEC meetings as observers.  This arrangement serves as an informal mechanism for coordinating policies.").

[9]     *Id.*

[10]     *Id.* at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independants] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices.  The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+.").  Throughout this complaint, references to OPEC from December 2016 onwards encompass OPEC+.

[11]     Guy Laron, *The OPEC+ Puzzle: Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, THE WILSON CENTER (Jan. 19, 2023), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-saudi-cooperation-starts-and-stops-oil-prices (despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians"); *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, THE N.Y. TIMES (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html (Antitrust specialists have concluded that "as more countries joined or allied themselves with the [OPEC] cartel, it has only become more effective at controlling the output of what would otherwise have been competing oil producers.").

online in Texas in 2002, U.S. shale producers were pumping enough shale oil to reverse a 35-consecutive-year trend of declining U.S. domestic crude oil production.  The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history – the "Shale Revolution."[12]

46.     Shale production posed a unique problem for OPEC.  Unlike the supermajors, who typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production begins, shale oil wells:  (a) require smaller capital commitments; (b) can be drilled in two to four weeks;[13] (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded.  Consequently, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors.  According to market analysts, "the shale sector's ability to boost production – and to scale back – relatively quickly is its calling card,"[14] which makes U.S. shale oil, **"as close to inventory-on-demand as oil ever comes**."[15]

47.     But Independents are like the supermajors in one important respect that is problematic for OPEC:  they are subject to the Sherman Act.  This means that while U.S. shale would come to produce as much oil as the largest OPEC and OPEC+ nations,[16] it was not a monolith capable of making industry-wide production decisions.  Rather, as a boon to gasoline

---

[12]     Robert Rapier, *How The Shale Boom Turned the World Upside Down*, FORBES (Apr. 21, 2017),  https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=497a463b77d2.

[13]     Ryan Moore, *The Numbers: The Permian Excels*, PHEASANT ENERGY (last updated Sept. 7, 2023), https://www.pheasantenergy.com/the-numbers-the-permian-excels (Defendant Pioneer, the largest acreage holder in the Midland Basin of the Permian, reported that as of 2018, it was taking Pioneer approximately 15 to 20 days to drill a well down 10,000 feet and horizontal out to 20,000 feet).

[14]     Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[15]     Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

[16]     By 2018, the United States eclipsed Saudi Arabia and Russia as the largest oil producer in the world. Devin Krishna Kumar, *U.S. expected to end 2018 as world's top oil producer: EIA*, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expected-to-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

consumers like Plaintiffs and members of the proposed classes, U.S. shale producers were a group of relatively smaller producers, bound by law to compete with each other, and OPEC.

48.     So U.S. shale's arrival on the global oil scene in the early-to-mid-2010s was a nightmare for OPEC.  The U.S. shale movement was dubbed "Cowboyistan"[17] in the industry for Independents' "drill-first, ask-questions-later" business model.[18]   A "new oil order" had emerged.[19]  The aggressive competition of U.S. shale producers usurped the Saudi swing producer role,[20] and saw U.S. domestic production erode OPEC-set cartel price premiums.

**C.     Cowboyistan Must Die: the 2014-2016 "OPEC Price War"**

49.     As sovereign nation-states with GDPs (and, in some cases, currencies) heavily reliant on crude oil prices, OPEC was not about to willingly cede the pricing power OPEC had held over global oil prices for a half-century to U.S. shale producers.

50.     Perhaps underestimating the willingness of American companies to flaunt the Sherman Act, or perhaps the result of a rebuffed invitation(s) not yet publicly known, at some point in 2014, OPEC determined Cowboyistan could not be bought and had to go.

51.     Consequently, despite a global oversupply of crude oil, in mid-2014 OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the

---

[17]     Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/?sh=bc9df884ed2.

[18]     Barney Jopson, *Fracking: The Energy revolution that shook the world*, FIN. TIMES (May 6, 2015), https://www.ft.com/content/6fab1192-f30d-11e4-a979-00144feab7de.

[19]     Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[20]     Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices*, CNBC (Oct. 27, 2014), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html (U.S. shale's spare capacity – the amount of crude a country is able to produce in 30 days in case of an emergency – was almost four times that of Saudi Arabia's); David Livingston & Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659 ("consensus has developed that Saudi Arabia has surrendered its role as de facto manager of the world oil market to U.S. shale oil producers" because "shale wells take less time to drill and complete than comparatively larger conventional oil projects, which require years and many millions of dollars to move from planning into first production").

market share it had lost to Independents, and to push oil prices to a level that would render U.S. shale oil no longer economically viable.[21]  This two-year period of open global competition, dubbed within the industry as the "OPEC Price War," had begun:

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)**



Daily crude oil spot prices, 2010-16
dollars per barrel

Brent
West Texas Intermediate

Source: U.S. Energy Information Administration, based on Thompson Reuters

52.     The OPEC Price War dragged on for years for two reasons.  First, shale production was a brand-new industry where technological advancements and accumulating experience was driving breakeven points lower,[22] allowing Independents to exploit less productive shale plays

---

[21]     Siripurapu & Chatzky, *supra* n.7; Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off#xj4y7vzkg (In February 2016, Saudi Arabia's Oil Minister Al-Naimi warned U.S. shale producers, "[l]ower costs, borrow cash, or liquidate.").

[22]     In the beginning of 2014, "Rystad Energy estimated the average breakeven price for tight oil to be $82 per barrel," but by 2018, the average breakeven price reported had dropped to $47 per barrel, and by 2021, $37 per barrel.  *See Rystad Energy: As falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, ROGTEC MAGAZINE (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand/; Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455 ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about $100 a barrel in 2014 to $64 a barrel in 2019, shale oil production has doubled by 100% during this period.").

13

profitably.[23]   Second, the U.S. legal structure (including corporate and bankruptcy law), encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.

53.   As a result, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop caused by OPEC's Price War.[24]

54.   Yet, the OPEC price war consolidated the U.S. shale industry, causing dozens of smaller Independents to fail[25] and larger Independents, like Defendants, to rally together in the face of a shared adversary.

**D.    If You Can't Beat 'Em: Cowboyistan Takes a Seat at the "Table on Pricing"**

55.   Weary after years of low prices,[26] OPEC changed tactics.  First, as noted above, in December 2016, it struck a deal with 10 non-OPEC oil producing nations to form OPEC+.  Having brought one enormous potential competitor (Russia) into the fold, OPEC turned its attention to Cowboyistan.

---

[23]   A shale oil "play" refers to a specific geographic area or region where shale formations contain significant amounts of oil that can be economically extracted.  The top three shale oil plays in the U.S. are the Permian Basin in Texas and New Mexico (40% of all U.S. crude production in 2022), the Bakken Formation in North Dakota and Montana, and Eagle Ford in Texas. Technological advancements have made more shale oil plays economically viable over time.

[24]   Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

[25]   Matt Egan, *OPEC tried to put this US shale oil driller out of business. It 'backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html#:~:text=Saudi%20Arabia%2Dled%20OPEC%20launched,went%20out%20of%20business%2C%20too.

[26]   Mufson, *supra* n. 24 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices.  But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

14

56.     Unable to beat Independents in the free market, OPEC started a years-long campaign to bring them into the cartel.

57.     Independents, too, were weary of the price war.  As reported by MarketWatch on September 8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[27]  Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to slide in crude oil prices."[28]  Hamm and Defendants had gained leverage and the respect of OPEC during the price war.  Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball with OPEC.

58.     Shortly thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together.[29]  Many of these meetings took place on the sidelines of the CERAWeek Conference, held annually in Houston, Texas.

59.     March 6-10, 2017 – Houston, TX, USA (CERAWeek Conference):   Former Nigerian politician and then-OPEC General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., John Hess of [Defendant] Hess Corp., Robert Douglas Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho Resources Inc."[30]  OPEC had purportedly never before met with U.S. shale producers,[31]

---

[27]     Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[28]     *Id*.

[29]     Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

[30]     Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[31]     *Id*.

leading to reporters describing the meeting as "unusual."[32] Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[33] Scott Sheffield of Defendant Pioneer stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US [I]ndependents than I have seen over my entire career."[34]

60.     Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bi-lateral" meetings with shale executives, according to Defendant Hess's CEO, John Hess.[35] Following a dinner with OPEC officials, Hess reported to Bloomberg, "***It was a very good exchange of information and views about oil*** . . . I really commend the OPEC Secretary General for outreach.  It was a good talk."[36] OPEC Secretary General Barkindo confirmed everyone was on the same page regarding the need to collectively work to achieve price stability following the meeting, because "no-one wants to see a repeat of 2015 and 2016."[37]

61.     During CERAWeek 2017, OPEC and the U.S. shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[38] Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. shale producers that if they wanted to collaborate, there would be no "free rides" on

---

[32]     *Id*.

[33]     *Id*.

[34]     David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG, (Mar. 7, 2017).  https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

[35]     CERAWeek 2017: Encouragement & engagement, 47 OPEC BULLETIN 2, (Mar./Apr. 2017),           https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palace-vienna-austria.html, at 16.

[36]     Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[37]     OPEC BULLETIN, *supra* n.35, at 15.

[38]     Blas, *supra* n.36.

OPEC production cuts, and they must be ready to pull their weight when the time comes.[39]  Put another way, OPEC told U.S. shale producers that OPEC expected Independents to work together and coordinate their production cuts alongside OPEC.

62.     Later that year OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[40]  Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental Resources during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[41]

63.     March 5, 2018 – Houston, TX, USA (CERAWeek Conference):  In February 2018, discussing plans to meet with U.S. shale executives for the second year in a row at the upcoming March 2018 CERA Week conference, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek." [42]   Barkindo explained that OPEC and the U.S. shale industry agreed at their first meeting in 2017, that they had a "shared responsibility" towards the oil markets.[43]  The 2018 CERAWeek dinner between OPEC members and U.S. shale producers, including Defendants, was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices, per Barkindo.[44]

64.     On March 5, 2018, OPEC officials met with U.S. shale executives at Houston's "The Grove" restaurant, during which Secretary General Barkindo gave a speech to dinner

---

[39]     Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-saudi-shale/exclusive-saudis-tell-u-s-oil-opec-wont-extend-cuts-to-offset-shale-sources-idUSKBN16G2TJ.

[40]     Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[41]     *Id*.

[42]     Blas & Smith, *supra* n.30.

[43]     *Id*.

[44]     *Id*.

attendees.  Afterwards, Defendant Pioneer's then-CEO Tim Dove summarized Barkindo's speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."  Defendant Centennial's CEO, Mark Papa described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[45]

65.    OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, described the meeting between OPEC and U.S. shale executives as much more than generalizations, with the key takeaway being a shared commitment to exchange confidential production information:  "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[46]  Lima explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put another way – coordinating production decisions to impact the price of crude oil rather than allowing market forces to dictate outcomes.[47]

66.    Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for U.S. shale to "take some responsibilities in terms of stability of oil prices."[48]  Indeed, Secretary General Barkindo confirmed that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward.  I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives]

---

[45]    Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-and-opec-share-steak-in-uneasy-truce-at-houston-dinner-idUKL2N1QP05R.

[46]    *Id*.

[47]    *Id*.

[48]    Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347.

have shown in continuing this energy dialogue."[49]  Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."[50]

67.    As one shale executive, who insisted on remaining anonymous, described it to Reuters, Cowboyistan had parlayed their successful price-war resistance into a seat at OPEC's "***table on pricing***."[51]

68.    In the wake of the 2018 conference, Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, even "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[52]

69.    June, 2018 – Vienna, Austria (7th OPEC International Seminar):  Following the CERAWeek 2018 dinner, Secretary General Barkindo invited U.S. shale officials to join him at an OPEC summit in Vienna in June 2018.[53]  Defendant's executives Scott Sheffield (Pioneer) and John Hess (Hess) attended the June 2018 OPEC International Seminar in Vienna, Austria.  At the event, Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market.  None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[54]  Sheffield urged, "OPEC needs to fulfill its duty."[55]

---

[49]    *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51.

[50]    Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[51]    Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[52]    Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO!NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

[53]    Domm, *supra* n.50.

[54]    Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rsc-idINKBN1JG2OB.

[55]    *Id*.

70.     Critically, the 2018 OPEC summit in Austria was the first time Defendants admitted publicly to more than listening to OPEC during these meetings.  Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference . . . .  If they don't we are going to see $100 oil or higher."[56]

71.     Sheffield delivered a message, and apparently got one in return – two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[57]

72.     January, 2019 – Davos, Switzerland (World Economic Forum):  In January 2019 at the Davos World Economic Forum, OPEC's Secretary General sat on a panel with John Hess, CEO of Defendant Hess Corp, Vicki Hollub, CEO of Defendant Occidental, and Dan Yergin, Vice Chairman of IHS Markit.[58]

73.     According to Reuters, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.[59]  OPEC's Secretary General addressed the current oil market dynamics at Davos, highlighting the importance of OPEC+ in helping stabilize the oil market over the past two years following the price war.[60]  He also underscored that market

---

[56]     Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[57]     *Compare id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") *with* Rania El Gamal, et al., *OPEC agrees modest hike in oil supply after Saudi and Iran compromise*, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply.  Iraq said the real increase would be around 770,000 bpd[.]").

[58]     IHS performs market analyses on behalf of OPEC member nations.

[59]     Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG.

[60]     *Id.*

20

1  uncertainties and volatility are detrimental to industry investments, and that continuing joint and

2  collaborative efforts among producers were crucial to ensure timely investments.[61]

3       74.    These comments were praised by Hess, who said that "the Secretary General of

4  OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so

5  those efforts are to be recognized."[62]   Referencing OPEC's relationships with Defendants,

6  Barkindo emphasized, "[w]e have to continue to collaborate.  It is one industry.  It is a global

7  industry, and I think our colleagues in the US are on the same page with us and we will work

8  together to exchange views."[63]

9       75.    March 11-14, 2019 – Houston, TX, USA (CERAWeek Conference):  For the third

10  consecutive year, U.S. shale executives met with OPEC members during CERAWeek.

11  Bloomberg reported that "[t]he event has become an informal communication channel between

12  the cartel and fast-growing shale producers."[64]  Discussing his upcoming meeting with U.S. shale

13  executives, Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S.

14  shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue

15  because we broke barriers . . . .  It is essential we continue the conversation with U.S. shale

16  industry."[65]

17       76.    Barkindo reported that a Monday night dinner attended by CEOs John Hess, Vicki

18  Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and

19  Diamondback, respectively,[66] included a "friendly conversation on current industry issues and the

20

21  [61]    *Id*.

22  [62]    Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer
    group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-
23  opec-hess-ceo-says-the-group-deserves-praise.html.

24  [63]    *Id*.

    [64]    Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third
25  Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-with-
    shale-competitors-for-third-year-1.1227226.

26  [65]    *Id*.

27  [66]    *CERAWeek 2019 in Review – New World of Rivalries: Reshaping the Energy Future*,
    CERAWEEK.COM   (Mar.   2019),   https://cdn.ihsmarkit.com/www/pdf/0819/CW19Review.pdf.;
28  Javier Blas & Rachel Adams-Heard, *OPEC Splits Avocado Appetizer with Shale Adversaries in*

immediate prospects and challenges for all."[67]   Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[68]



*Hess (left) was pictured with OPEC Secretary General Mohammed Barkindo (center) in Houston on March 11, 2019*[69]

77.    In January 2019, OPEC and its allies began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months.[70]   After the cuts were announced, Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep

---

*Texas,* BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year#xj4y7vzkg.

[67]     Blas & Adams-Heard, *supra* n.66.

[68]     *Id.*

[69]     *Id.*

[70]     Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

their profits flowing."[71]   At CERAWeek 2019, Barkindo indicated that OPEC and allies will continue supply adjustments through 2019.[72]

**E.      2021: Defendants Actualize Their Agreement with OPEC**

78.      It is unclear when, exactly, Defendants began coordinating their output in conjunction with OPEC.  Through the end of 2018, it at least appeared to the outside world that OPEC's pleas were falling on deaf ears:

**Figure 2: Change in Crude-Oil Production – U.S. Shale Oil v. OPEC (2014 – 2019)[73]**



Source: U.S. Energy Information Administration

---

[71]      Jennifer Hiller, *U.S. shale producers see OPEC pullback helping 2019 profits*, REUTERS (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I/#:~:text=HOUSTON%2C%20 Dec%207%20(Reuters),would%20keep%20their%20profits%20flowing.

[72]      *OPEC Secretary General on Saudi Arabia's oil production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

[73]      Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826.

79.     Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[74]

80.     The second wave never occurred.  In 2020, lockdowns associated with the COVID-19 pandemic cratered gasoline demand, sending multiple shocks through the world oil markets. Worldwide oil production fell,[75] and the U.S. shale oil industry consolidated and suffered as production fell and smaller Independents went bankrupt.[76]

81.     During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end their price war and market share competition once-and-for-all and collaborate on their respective production levels, and consequently, global crude oil prices.  In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants played ball: "We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves.  They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers.  There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. . . . Everybody has a role to play. . . .  We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry."[77]  On November 28,

---

[74]     *Id.*

[75]     Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html (due to the global Coronavirus pandemic and market panic, OPEC members agreed to "slash[] output [of crude oil] by a record-shattering 9.7 million barrels per day").

[76]     Irina Slav, *Shale Executives See Little Chance of Significant Growth*, OILPRICE.COM via BUSINESS INSIDER (Dec. 6, 2020), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633 ("Between January and October, 43 oil and gas producers in North America filed for bankruptcy protection.  Most of them were from the shale patch.").

[77]     *OPEC Secretary General: No objective to drive US shale out of business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business.

2020, Defendant EOG Resources' CEO Bill Thomas confirmed Defendants' willingness, as a group, to follow OPEC's lead on pricing: "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil prices. . . .  We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[78]

82.     When the world emerged from the pandemic in early 2021, gasoline demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021.  As OPEC and OPEC+ countries emerged from the pandemic, they collectively withheld production to push up prices further.[79]

83.     Defendants also responded to rising prices by withholding production, suddenly (and in near-unison) preaching supply "discipline" for the first time in the history of U.S. shale. Over the course of 2021, Defendants would continue to signal to each other, OPEC, and the market that they were no longer competing for market share or willing to act as swing producers:

        a. In a February 2021 interview, Defendant Chesapeake CEO Doug Lawler explained that U.S. shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[80]  Defendant Pioneer CEO Scott Sheffield agreed, predicting that small companies would increase output but in the aggregate U.S output would remain flat, even if crude prices go above $60, as the large U.S. Independents would jointly practice discipline.[81]

[78]     Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[79]     Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[80]     Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

[81]     *Id*.

b. In March 2021, on the same day OPEC announced supply restrictions, Defendant Occidental CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, U.S. oil production would not return to pre-pandemic heights, because Defendants and other U.S. shale producers were "committed to value growth, rather than production growth."[82]

c. In April 2021, Pioneer CEO Sheffield said that U.S. shale producers risked another price war with OPEC and its allies if they resumed the breakneck production growth of the last decade.  He also balked at the federal government's forecasts that predicted an increase in domestic oil production, and instead declared he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."[83]

d. In a June 2021 interview with Reuters, Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[84]  According to Reuters, "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[85]

---

[82] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.

[83] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[84] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[85] *Id.*

e.  On an August 5, 2021 earnings call, Defendant EOG President and CEO Bill Thomas, echoing Lawler's February 2021 language, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started.  I think OPEC+ is solid.  I think the U.S. will remain disciplined.  And so, I think the industry is in for a long run of really good results."[86]

f.  On October 3, 2021, Defendant Pioneer CEO Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control,"[87] reflecting Defendants' production restraint agreement.  Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent,[88] $80 Brent, or $100 Brent . . . ."[89]

84.  Given that Defendants' breakeven prices at the time were around $40/barrel,[90] Defendants' newly-discovered restraint came as a surprise to some oil industry observers:

---

[86]  EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[87]  Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says,* FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[88]  "Brent" refers to Brent crude, a widely recognized benchmark for pricing crude oil internationally.  The price of Brent crude oil is determined through trading on the Intercontinental Exchange ("ICE") in London.  It is often used as a reference point for setting oil prices.

[89]  Brower & Sheppard, *supra* n.87.

[90]  EOG Resources, *Value Matters: 4Q 2021 Presentation*, (2022), https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf (Defendant EOG's price needed to secure 10% return on capital, not breakeven, was ~$40); Occidental Petroleum Corp., *Q3 2020 Earnings Call Tr.*, OXY.COM (Nov. 10, 2020), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20 Transcript.pdf (Defendant Occidental's breakeven price ~$40); Diamondback Energy, *Investor Presentation* (Nov. 2021), at Slide 11, https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2 (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.").

a. In January 2021, Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[91]

b. In June 2021, another Reuters columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[92] 2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[93] However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[94] The author noted that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."[95]

c. On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling Chesapeake CEO that their plans to slow production would be "the easiest way to destroy value" for the company in the long term.[96]

---

[91] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (Jan. 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[92] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[93] Hampton, *supra* n.91.

[94] Kemp, *supra* n.92.

[95] *Id.*

[96] Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022),

85.     OPEC, however, was not surprised.  In early 2021, OPEC estimated that U.S. shale production would see a significant annual drop.  Reuters reported that anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[97]  OPEC also signaled that the price war was over.  Secretary General Barkindo told Reuters that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "have a shared responsibility in this regard."[98]

**F.     2022-2023:  $200 a barrel?  No Thanks**

86.     In 2022, after Russia invaded Ukraine, crude oil prices spiked.  Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease in the volume of oil available in the U.S. market, both from increased strain on supply chains, and more importantly, the separation of Russia's oil production from the world market.

87.     By mid-2022, oil crossed $120 a barrel.  At this price, oil cost more than at any point during the five-year runup to the OPEC Price War, and nearly quadruple the 2016 price war low water mark.

88.     OPEC responded to the possibility that the high prices might recede with further production restraint, including cuts in October 2022 of "two million barrels per day."  These amounts were announced as crude prices began to normalize from their near-record highs, and were intended to "stabilize the recent fall in global energy prices."[99]

89.     Despite record prices in 2022 and consistently high prices in 2023, in a break from their prior behavior,[100] Defendants refused to increase production in an independently economically rational manner:

---

https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nick-dellosso-on-q4-2021-results-earnings-call.

[97]     Lawler & Hiller, *supra* n.80.

[98]     *Id*.

[99]     Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

[100]     *See* Lawler & Scheyder, *supra* n.51; Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured-

a. In February of 2022, as Russian troops staged on the Ukrainian border in advance of the invasion, Sheffield again made comments that support the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line" and "I'm confident they will continue to stay in line."[101]   Indeed, following the massive 2022 oil price spike during which oil prices increased 20% between just January and February 2022, Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[102]

b. Later in February, other Defendants signaled their alignment.   During an earnings call, Defendant Continental's CEO Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years . . . ."[103]

c. Defendant Diamondback's executive Stice explained on February 22, 2023, "we have no reason to put growth before returns . . . we will continue to be disciplined."[104]

d. Bloomberg reported on February 24, 2022 that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers. . . . like

---

reports/as-oil-prices-plunge-what-will-swing-producers-do.html (in the past, "higher [crude oil] prices incentivized an enormous increase in U.S. production", and even OPEC members understood that "[i]t's normal for shale oil, tight oil [production] to increase . . . whenever oil prices support it.").

[101]   Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said%20this%20week.

[102]   *Id.*

[103]   *Id.*

[104]   Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

30

[Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year."[105]

e.   In March 2022, Occidental Petroleum's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in U.S. shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.[106]

f.   On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023 and it was "committed to remaining disciplined" despite ideal economic conditions for production increases.[107]   In 2022, EOG increased production by only 4% and said it was targeting the same increase in 2023.[108]

g.   In January 2023, Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[109]

h.   When asked in a March 2023 interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now,"

---

[105]   Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[106]   Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

[107]   EOG Resources (EOG), *Q2 2022 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[108]   Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/.

[109]   Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

"gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower U.S. consumer gas prices, despite having the ability to profitably increase production.[110]

90.     Again, knowing Independents' breakeven prices were continuing to fall,[111] oil industry observers expressed disbelief at Defendants' refusal to compete for market share:

     a.  In the words of the Washington Post, the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[112]

     b.  A February 2022 Bloomberg article wondered why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[113]

---

[110]     Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[111]     *E.g.*, Press Release, *Continental Resources Announces Record 2021 Results; 2022 Projections Highlight Increasing Cash Flow and Corporate Returns, News Release (Exhibit 99.1)*, SEC ARCHIVES (Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/732834/000119312522042827/d272362dex991.htm (Defendant Continental reported that for 2022 it was "projecting an approximately $30 WTI free cash flow breakeven price."); Centennial Resource Development Inc., *2022 Corporate Sustainability Report*, PERMIAN RES.COM (2022), https://permianres.com/wp-content/uploads/2022/08/Centennial-2022-Corporate-Sustainability-Report.pdf. ($32 breakeven for Defendant Centennial); *Using Scenarios to Understand Risks, Opportunities*, CHESAPEAKE ENERGY (2023), https://sustainability.chk.com/climate/portfolio-resilience/ (Defendant Chesapeake breakeven between $33 and $42); *Investor Relations Presentation, May 2022*, HESS CORP. (May 2022), https://investors.hess.com/static-files/3814592c-05ea-4659-9651-88012e29468f (Defendant Hess breakeven ~$45); *The Value Portfolio: Pioneer Natural Resources is Heavily Undervalued*, SEEKING ALPHA (Aug. 9, 2023), https://seekingalpha.com/article/4593056-pioneer-natural-resources-heavily-undervalued (Defendant Pioneer breakeven $39); Irina Slav, *Running Out of Sweet Spots: Shale Growth May Not Materialize*, MARKETS INSIDER (Feb. 7, 2022), https://markets.businessinsider.com/news/stocks/running-out-of-sweet-spots-the-biggest-problem-for-us-shale-1031168908 ("Technologically, oil and gas resources can be stretched to near infinity as drilling technology advances further and further.").

[112]     Denning, *supra* n.14.

[113]     Crowley, *supra* n.105.

c.   In March 2022, a CNBC anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[114]

d.   Again in March 2023, the Financial Times published an article titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"[115] Another March 2023 article, this one from CNBC, was titled "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."[116]

e.   On April 3, 2023, after OPEC made further cuts, Bloomberg reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record profits."[117]   According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[118]

91.   Defendants also continued meeting with OPEC officials in 2022 and 2023:

a.   **2022:** Once again, Defendants met with OPEC officials during the 2022 CERAWeek Conference in Houston, Texas between March 6-10, 2022. Reuters reported that at the time of this conference, "[i]t was at least the fourth

---

[114]   Stevens, *supra* n.106.

[115]   Myles McCormick, Derek Brower, & Justin Jacobs, *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, Fin. Times (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[116]   Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[117]   Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, Bloomberg (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[118]   *Id.*

time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns."[119]  In Houston, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution.  Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[120]  As Reuters noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[121]  Chesapeake CEO Domenic Dell'Osso confirmed that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[122]

b. **2023:**  In March, 2023, FT reported that "about two dozen [U.S. shale executives] including [Defendants' executives:] Sheffield [of Pioneer], . . . Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[123] for a private dinner

---

[119]  Liz Hampton & Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7, 2022), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/.   In attendance: EQT Corp Chief Executive Officer Toby Rice, Hess Corp CEO John Hess and Chesapeake Energy CEO Domenic Dell'Osso.

[120]  Hampton, *supra* n.29.

[121]  *Id.*

[122]  *Id.*

[123]  In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor.  Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away.  According to the New York Times, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces."  Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html#:~:text=Barkindo%20was%20scheduled%20to%20leave,how%20much%20oil%20OPEC%20produces.

34

in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits."[124]   During this dinner, it was reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner."[125]   In the article, Sheffield doubled down on his support of OPEC, "I think the people that are in charge now are three countries – and they'll be in charge the next 25 years. . . .   Saudi first, UAE second, Kuwait third."[126]

92.   Early in 2023, Defendants removed all doubt that they were coordinating with OPEC.

93.   On January 5, 2023, Defendant Pioneer's CEO Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change . . . . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut . . . . [W]e'll see what happens in the next 90 days."[127]

94.   87 days later, OPEC "shocked traders around the world"[128] when it announced a "surprise" production cut, when OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[129]

---

[124]   Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[125]   *Id*.

[126]   *Id*.

[127]   Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa#xj4y7vzkg.

[128]   *Id*.

[129]   Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

95.     In between Sheffield's prediction and the reveal, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements.  This left Defendants "suddenly vulnerable" and exposed them to massive economic risk if oil prices went down.[130]

96.     Indeed, Defendant Pioneer's CEO Sheffield defended the extraordinarily risky move, stating "we're not going to hedge," and that he was still "optimistic that we'll see $100 a barrel before the end of the year."[131]

97.     Less than a week after news emerged of Defendants' exposed positions, on April 2, 2023, OPEC announced their "surprise" production cut, slashing 1.15 million barrels of oil production per day.[132]  Defendants' failure to hedge was inexplicable but for their advanced knowledge of OPEC's planned production cuts.

98.     In April 2023, an energy analyst succinctly summarized the effects of Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up.  That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects.  Today, shale is as responsive as in the past.  But there's a difference. ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share***.  Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[133]

99.     Independents had the ability to increase production and gain market share, they just chose not to:

---
[130]     Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[131]     *Id*.

[132]     Reuters, *supra* n.129.

[133]     Blas, *supra* n.21.

**Table 1:  Defendants' U.S. Oil Production Growth Rates In pre- and post-Class Period**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian[134] | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

100.   Defendants' production restraint agreement worked.  Defendants are reaping the rewards in the form of massive revenue increases, while not reinvesting that additional revenue into new production.  Compare Figure 3 with Figures 4, 5, 6, 7, 8, 9, and 10 (recording Defendants' revenue growth after 2020).

---

[134]   On September 1, 2022, Centennial Resources merged with Colgate Energy Partners II, LLC to form Permian Resources. *Centennial, Colgate Finalize $3.9B Merger; Debut as Permian Resources Corp*, SHALE EXPERTS (Sept. 1, 2022), https://www.shaleexperts.com/articles/Centennial-Colgate-Finalize-3.9B-Merger-Debut-as-Permian-Resources-Corp_999951603. Accordingly, the 56% figure listed in Table 1 for Centennial is its 2021-2022 pre-merger growth rate as public figures do not permit Plaintiffs to back-out production figures from Colgate's rigs post-acquisition.

1

2

**Figure 3, U.S. Shale Producer's Reinvestment Rate (capital expenditure as a percentage of operational cash flow)**



**Figure 4. Pioneer's Annuel Revenue (USD)**



**Figure 5. Permian/Centennial's Annuel Revenue (USD)**



**Figure 6. Chesapeake's Annuel Revenue (USD)**



**Figure 7. Continental's 's Annuel Revenue (USD)**



**Figure 8. Diamondback's Annuel Revenue (USD)**



**Figure 9. EOG's Annuel Revenue (USD)**



**Figure 10. Occidental's Annuel Revenue (USD)**



### G.    Defendants' "Restraint" Is Economically Irrational, Absent Agreement

101.    The terms Defendants used may have varied: being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns."  But they are all code

words for each Defendants' agreement to coordinate and restrain domestic shale oil production. Further, Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

102.    In a competitive market for arguably the most important commodity on earth: crude oil, expanding production to take advantage of prices above your breakeven is the economically rational response.  If you do not, your competitor will; taking margin share and reinvesting their additional profits into further productive capacity and/or efficiency gains.  Defendants taught OPEC this lesson during the Shale Revolution.

103.    In a competitive market, no single Defendant would restrain production unless they *knew* their competitors would also restrain their production.  No business in a competitive market would turn down opportunities to make three times marginal cost (*i.e.*, breakeven), and couch that economically irrational decision with a preposterous statement about focusing on "shareholder returns."  In a competitive market, if you are not drilling that oil, someone else is.

104.    And others did drill some of that oil.  Notoriously conservative and well-known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive), the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, in direct response to U.S. shale producers "underinvesting as an industry":[135]

   a.  ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.[136]

   b.  Similarly, Chevron planned on a 10% increase in the same region in 2022 "from an even larger production base."[137]

---

[135]    Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/business/energy-environment/exxon-chevron-oil-gas-profit.html.

[136]    Kevin Crowley, et al., *Exxon and Chevron Plan Permian Oil Surge as Peers Preach Caution*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-01/exxon-joins-chevron-in-permian-oil-surge-as-peers-preach-caution.

[137]    *Id.*

      c.  Mid way through 2022, Chevron anticipated a "15% year-over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."[138]

      d.  In May 2023, ExxonMobil Chief Executive Darren Woods said that Exxon is hoping to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.[139]

105.    Smaller, non-public shale companies drilled some of that oil, too.  In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[140]  Due to the gap in production left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[141]  For example, Reuters reported that, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[142]

106.    But small shale oil producers going from one rig to two is not enough to meaningfully move U.S. production when Defendants control 18% of the total active oil rigs in the U.S., including conventional oil rigs and rigs owned by supermajors.[143]  With those rigs, in 2023 Defendants were responsible for approximately 16.2% of U.S. total crude oil production (including conventional crude oil).  Defendants are able to leverage their collective market share because of how fragmented the domestic oil market is: of the 247 companies operating oil rigs in

---

[138]    *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows.

[139]    Sabrina Valle, *Exxon CEO Says Technology Advances Could Double Its Shale Output*, REUTERS (June 1, 2023), https://www.reuters.com/business/energy/exxon-ceo-says-5-year-program-could-double-its-shale-output-2023-06-01/.

[140]    Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, Reuters (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

[141]    *Id.*

[142]    *Id.*

[143]    Data obtained from https://oilgasleads.com/top-drilling-company/ on December 11, 2023. Figures reflect a snapshot of rigs operating at December 2023.

the U.S., 162 companies are running just one rig.[144]  Only 10 companies own 15 or more rigs –
five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the
other five are supermajors (Exxon, Chevron, and ConcoPhillips).[145]

107.   Moreover, Defendants' market power is exacerbated by the fact that conventional
oil production in the U.S. is largely fixed, and cannot quickly add or remove production volume
in response to price changes.

108.   OPEC believes itself to be outside the reach of the Sherman Act, so OPEC doesn't
use code words when describing its coordination with, and the coordination amongst, Defendants:
OPEC and Defendants "collaborate,"[146] "compare[] notes[s],"[147] "work together to exchange
views,"[148] discuss "how [OPEC and Defendants] should proceed going forward,"[149] "further
explore the mechanic of achieving [OPECs and Defendants'] common objective,"[150] and discuss
OPECs and Defendants' "shared responsibility"[151] for global oil markets.

109.   Whether expressed in code words or frank terms, Defendants' agreement by and
between themselves and OPEC to coordinate U.S. domestic shale oil production is *per se* illegal
under the Sherman Act.

## V.   PLUS FACTORS

110.   The presence of a number of factors, referred to as "plus factors" and "super plus
factors" render the U.S. shale oil industry highly conducive to collusion.  Plus factors are
"economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that

---

[144]    *Id*.

[145]    *See supra* n.143.

[146]    DiChristopher, *supra* n.62.

[147]    *OPEC bulletin Special Edition*, supra n.49, at 51(OPEC Secretary General Barkindo).

[148]    DiChristopher, *supra* n.62.

[149]    *OPEC bulletin Special Edition*, supra n.49, at 51 (OPEC Secretary General Barkindo).

[150]    Blas & Smith, *supra* n.30 (OPEC Secretary General Barkindo).

[151]    Sam Meredith, *OPEC Calls on US Shale Oil Producers to Accept 'Shared Responsibility' of Slashing Global Supply,* CNBC (Oct. 10, 2017), https://www.cnbc.com/2017/10/10/opec-calls-on-us-shale-oil-producers-to-accept-shared-responsibility.html  (OPEC  Secretary  General Barkindo).

44

are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[152]  "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[153]

111.    The following plus and super plus factors alleged herein support an inference that Defendants' actions constituted a per se unlawful price-fixing conspiracy, not merely parallel conduct:

a.  The market conditions for U.S. shale oil are favorable to collusion.   As discussed above, the U.S. shale oil industry is highly fragmented, with a small number of larger producers and hundreds of smaller producers.  These larger producers (Defendants) have excess capacity; and have industry trade associations they regularly take part in, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.  As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that excess capacity.

b.  The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand.[154]

---

[152]    William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[153]    *See id.* at 426.

[154]    Gasoline itself has highly inelastic demand, meaning that very few consumers will switch to alternative products as the price at the pump rises.  This reinforces the inelasticity of upstream demand for crude oil.

c.  Defendants' actions were against Defendants' independent self-interests but for the existence of an agreement.  As detailed above, Defendants repeatedly met with each other and OPEC representatives and discussed amongst themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information.  No rational business would share this proprietary and competitively sensitive information with a direct competitor, absent collusion.  Following these exchanges, Defendants then decided not to increase their respective production volumes when that would have been in their individual rational economic best interests, given rising prices.  Instead, Defendants withheld production in a manner that would only be in their individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels so as to maintain crude oil prices at artificially high levels.  Defendants repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

## VI.    ANTITRUST INJURY

### A.    Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Crude Oil Throughout the Class Period

112.    Historically, global crude oil demand was primarily met by oil obtained from conventional drilling.  Following the Shale Revolution, the influence of U.S. shale production on crude oil prices (and gasoline prices) is undeniable, a fact recognized by market analysts and economists.

a.  A Forbes article from 2019, claims that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because,

since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[155]

b.   In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, US shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[156]

c.   In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors declared that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.[157]

d.   In 2020, economists from the Federal Reserve Bank of Dallas found that without the shale oil revolution, oil prices would have risen by 36% in 2018.[158]

e.   In 2023, an article in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."[159]

113.   As noted above, U.S. Independents' output decisions have a disproportionate impact on the price of crude oil because they are swing producers for the global market.[160] When competing with each other (and OPEC), as the largest Independents in a very fractured production

---

[155]   Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

[156]   Irma Alonso Alvarez 7 Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

[157]   *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[158]   Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[159]   Rodhan, *supra* n.22, at 433-43.

[160]   Lee, *supra* n.20.

47

landscape, Defendants have sufficient market power to dictate whether the U.S. can produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

114.    Defendants acknowledge that they have this power, and are choosing not to use it. For example, on March 2, 2022, the New York Times reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."[161]

115.    Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

116.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total U.S. shale production.  In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[162]

### B.    Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Retail Gasoline Purchased by Plaintiffs and the Class

117.    Gasoline consumers in the U.S., like Plaintiffs and the proposed class members, purchase gasoline from gas stations.  Approximately 54% of the U.S. price of gasoline is comprised of the price of crude oil used in the manufacturing process.[163]  Consequently, as

---

[161]    Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, The N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[162]    Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax,* CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[163]    *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (last accessed Jan. 12, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg.  The remainder of gasoline prices are driven by distribution and marketing costs (16%), refining costs (14%) and taxes (16%).

48

1    recognized by the U.S. Energy Information Administration, "[r]etail gasoline prices are mainly

2    affected by crude oil prices . . . ."[164]

3        118.    Indeed, Defendants' own trade association, the American Petroleum Institute

4    admits that "the price of crude oil is the primary determinant of the price we pay at the pump"[165]

5    and that "[n]ationwide on a quarterly basis, crude oil prices have explained more than 90% of the

6    variation in [U.S.] gasoline prices since 2020."[166]    Plaintiffs confirmed this relationship by

7    conducting their own preliminary regression analysis of monthly U.S. gasoline prices between

8    2001 and 2023, in which monthly refiner acquisition crude oil prices was the only variable.[167]

9    This regression returned a R-square of 90%.[168]    Put another way, between 2001 and 2023,

10   Plaintiffs' preliminary regression found that 90% of gasoline price variations in the U.S. can be

11   explained by the prevailing crude oil price.

12       119.    That crude oil prices drive gasoline prices is not surprising when one considers

13   how crude oil moves through the supply chain from Defendants to consumers. Defendants and

14   other producers of crude oil sell crude oil to refineries, who use chemical separation and reaction

15   processes to convert crude oil into gasoline and other products (*e.g.*, diesel oil, jet fuel, and other

16   _____

17   [164]    *Gasoline explained: Gasoline price fluctuation*, U.S. ENERGY INFO. ADMIN. (last updated
     Apr.      19,      2023),      https://www.eia.gov/energyexplained/gasoline/price-
18   fluctuations.php#:~:text=Gasoline%20%20 prices%20generally%20follow%20crude%20oil%20
     prices.&text=Gasoline%20prices%20tend%20to%20increase,expected%20gasoline%20demand
19   %20or%20consumption.

     [165]    *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Prices*, AM. PETROLEUM
20   INST., (last accessed Jan. 12, 2024), https://www.api.org/oil-and-natural-gas/energy-primers/gas-
     prices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline,gasoline%20
21   retailers%20pay%20to%20distributors.

22   [166]    *Id.   See also Factors that impact gas prices*, NACS (Apr. 05, 2023)
     https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon ("Retail gasoline prices move
23   an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").

24   [167]    A regression analysis is a statistical method that describes the relationship between two or
     more variables.  The regression method tests the relationship between a dependent variable (here
25   gasoline prices) against independent variables (here crude oil prices).  Plaintiffs used the "Refiner
     Acquisition Cost of Crude Oil" and "Weekly Retail Gasoline" data series maintained by the U.S.
26   Energy Information Administration.

27   [168]    R-square is a statistical measure in a regression model that determines the proportion of
     the variance in the dependent or "response" variable (gasoline price) that can be explained by the
28   independent variable or "mean" (crude oil prices paid by refiners).  A R-square of 0% represents
     a model that does not explain any of the variation in the response variables around the mean and
     a R-square of 100% represents a model that explains all the variation in the response on the mean.

manufacturing feedstocks).  The refineries then transport the gasoline to bulk terminal storage facilities. Because crude oil is the main raw material used to refine gasoline sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Class who were forced to purchase gasoline at artificially inflated levels.

**Figure 11: U.S. Gasoline Supply Chain**



120.    Gas stations purchase gasoline wholesale from refiners (or other gasoline marketers who have purchased from the refineries) at a price that is directly tied to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants. Gas stations set the price of retail gasoline above the wholesale price they pay, therefore passing on to Plaintiffs and the class any increase in the wholesale price.  Indeed, the National Association of Convenience Stores, a body which represents American gas stations, has confirmed that gas stations mark up the price they pay for gasoline by 35 cents a gallon on average when setting the price at the pump.[169]  This can be seen in Figure 12 immediately below, which shows that U.S. gas prices follow the prices paid by U.S. refineries for crude oil.

---

[169]    Lenard, *supra* n.4.

**Figure 12:  Refiners Crude Oil Acquisition Costs vs U.S. Average Gasoline Prices (Adjusted for Inflation)**



121.   Therefore, the price of crude oil has a direct effect on the price of retail gasoline.[170] Because crude oil is the main raw material used to refine gasoline sold in the United States, and because changes in crude oil prices drove changes in gasoline prices paid by Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline at artificially inflated levels.

## VII.   CLASS ACTION ALLEGATIONS

122.   Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of a class of indirect sellers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

---

[170]   Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html (In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs.").

> All persons and entities who purchased retail gasoline for personal use from a gas station in the United States between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

123.   Plaintiffs also bring this action on behalf of itself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following Class ("State Law Class"):

> All persons and entities who purchased retail gasoline for personal use from a gas station in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

124.   Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant.  Also excluded from both Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

125.   Both Classes are so numerous as to make joinder impracticable.  Plaintiffs do not know the exact number of Class members but the above-defined classes are readily identifiable and are ones for which records should exist.  Plaintiffs believe that due to the nature of the product market there are at least millions of members of both Classes in the United States.

126.   Common questions of law and fact exist as to all members of both Classes. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both Classes as a whole is appropriate.  Common issues of fact and law include, but are not limited to, the following:

> a.   whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or gasoline in the United States;

b. the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

c. whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

d. whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Class;

e. whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on gasoline;

f. the effect of Defendants' alleged conspiracy on the prices of retail gasoline sold in the United States during the Class Period;

g. the appropriate Class-wide measure of damages; and

h. the nature of appropriate injunctive relief to restore competition in the U.S. market for gasoline.

127. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for gasoline sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

128. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

129. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

130. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

131. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

1   similarly situated persons to prosecute their common claims in a single forum simultaneously,
2   efficiently, and without the unnecessary duplication of evidence, effort, and expense that
3   numerous individual actions would engender.  The benefits of proceeding through the class
4   mechanism, including providing injured persons or entities with a method for obtaining redress
5   for claims that it might not be practicable to pursue individually, substantially outweigh any
6   difficulties that may arise in management of this class action.  Moreover, the prosecution of
7   separate actions by individual members of the Classes would create a risk of inconsistent or
8   varying adjudications, establishing incompatible standards of conduct for Defendants.

9       132.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this
10  action as a class action under Federal Rule of Civil Procedure 23.

11  **VIII.   CLAIMS FOR RELIEF**

12      **A.      VIOLATION OF THE SHERMAN ACT**

13                              <u>**COUNT 1**</u>
                        **VIOLATION OF 15 U.S.C. §1**
14          **(On Behalf of the Nationwide Injunctive Relief Class)**

15      133.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
16  allegation set forth in the preceding paragraphs of this Complaint.

17      134.    From at least January 1, 2021, and continuing through the present, the exact dates
18  being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing
19  agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize
20  price for crude oil and retail gasoline in the United States, including by restraining their respective
21  production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

22      135.    In formulating and carrying out the alleged agreement, understanding, and
23  conspiracy, Defendants and their co-conspirators did those things that they combined and
24  conspired to do, including but not limited to the acts, practices, and course of conduct set forth
25  above, and the fixing, raising, and stabilizing of the price of crude oil and retail gasoline.

26      136.    The combination and conspiracy alleged herein has had the following effects,
27  among others:

28

54

a.  Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

b.  Prices for crude oil sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Those who purchased retail gasoline indirectly from defendants and their coconspirators for their personal use have been deprived of the benefits of free and open competition, and paid artificially high prices for gasoline.

137.  Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for retail gasoline purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

138.  Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**B.    VIOLATIONS OF STATE ANTITRUST LAWS**

139.  Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

140.  During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

141.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchange of competitively sensitive information between and among Defendants; and

participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

142.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels.  As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase gasoline than they otherwise would have in the absence of Defendants' unlawful conduct.  This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

143.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

144.    Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

145.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

146.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

**COUNT 2: ALABAMA**
**(On Behalf of Class Members that Purchased Gasoline in Alabama)**

147.    Due to Defendants' unlawful conduct, (1) competition for crude oil and gasoline was restrained, suppressed, and eliminated within Alabama; (2) gasoline prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*.

Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

## COUNTS 3 & 4: ARIZONA
### (On Behalf of Class Members that Purchased Gasoline in Arizona)

148.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout Arizona; (2) price of gasoline in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

149.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 5 & 6: CALIFORNIA
### (On Behalf of Class Members that Purchased Gasoline in California)

151.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout California; (2) gasoline prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce.  Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production.  The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce,

maintain, and stabilize the production of domestic shale oil.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of gasoline.  As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8: COLORADO
### (On Behalf of Class Members that Purchased Gasoline in Colorado)

154.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout Colorado; (2) gasoline prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

155.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq.*

156.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 9: CONNECTICUT
### (On Behalf of Class Members that Purchased Gasoline in Connecticut)

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and

eliminated throughout Connecticut, and (2) gasoline prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq*.

### COUNTS 10 & 11: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased Gasoline in District of Columbia)

158.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the District of Columbia; (2) gasoline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased gasoline in the District of Columbia, paid supracompetitive, artificially inflated prices for gasoline. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

159.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 12 & 13: FLORIDA
### (On Behalf of Class Members that Purchased Gasoline in Florida)

161.    Through their actions and actions of co-conspirators, crude oil and gasoline prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, competition in the gasoline

1    market was restrained, suppressed, and eliminated throughout Florida.  Plaintiffs and members of

2    the Class, including those who purchased gasoline in the State of Florida, paid supracompetitive,

3    artificially inflated prices for gasoline.  During the Class Period, Defendants' illegal conduct

4    substantially affected commerce in Florida.

5        162.    Defendants have violated the FLA. STAT. §542.15 *et seq.*, through their

6    anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief

7    available under FLA. STAT. §542.15 *et seq.*

8        163.    Defendants have engaged in unfair competition or unfair or deceptive acts or

9    practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, Plaintiffs and members of

10   the Class seek all relief available under that statute.

11                              **COUNT 14: HAWAII**
                 **(On Behalf of Class Members that Purchased Gasoline in Hawaii)**
12

13       164.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their

14   actions.  *See* HAW. REV. STAT. §§480-4, 480-13.  Through Defendants' actions and the actions of

15   their co-conspirators, gasoline prices in the State of Hawaii were raised, fixed, maintained, and

16   stabilized at artificially high levels, thereby injuring Plaintiffs and the Class.  Throughout the Class

17   Period, price competition for crude oil and gasoline was restrained, suppressed, and eliminated

18   throughout the State of Hawaii.  Plaintiffs and members of the Class, including those who resided

19   in the State of Hawaii and purchased gasoline in Hawaii, paid supracompetitive, artificially

20   inflated prices for their gasoline.   During the Class Period, Defendants' illegal conduct

21   substantially affected commerce in Hawaii.  Accordingly, Plaintiffs and members of the Class

22   seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

23                          **COUNTS 15 & 16: ILLINOIS**
                 **(On Behalf of Class Members that Purchased Gasoline in Illinois)**
24

25       165.    Defendants' combinations or conspiracies had the following effects: (1) price

26   competition in the crude oil and gasoline market was restrained, suppressed, and eliminated

27   throughout the State of Illinois, and (2) gasoline prices were raised, fixed, maintained, and

28

                                            60

stabilized at artificially high levels throughout the State of Illinois.  During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

166.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq*.

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 17: IOWA
**(On Behalf of Class Members that Purchased Gasoline in Iowa)**

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) gasoline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

## COUNT 18: KANSAS
**(On Behalf of Class Members that Purchased Gasoline in Kansas)**

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Kansas; (2) gasoline prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially

affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

### COUNT 19: MAINE
**(On Behalf of Class Members that Purchased Gasoline in Maine)**

170.    Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Maine; and (2) gasoline prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

### COUNTS 20 & 21: MARYLAND
**(On Behalf of Class Members that Purchased Gasoline in Maryland)**

171.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil and gasoline by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

172.    Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq*.

173.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 22 & 23: MICHIGAN
**(On Behalf of Class Members that Purchased Gasoline in Michigan)**

174.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the

State of Michigan, and (2) gasoline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

175.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

176.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 24 & 25: MINNESOTA**
**(On Behalf of Class Members that Purchased Gasoline in Minnesota)**

177.    Through their actions and actions of co-conspirators, gasoline prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the market for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Minnesota.  Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased gasoline there, paid supracompetitive, artificially inflated prices for gasoline.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

178.    Defendants have violated the MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

179.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

1

2

**COUNT 26: MISSISSIPPI**
**(On Behalf of Class Members that Purchased Gasoline in Mississippi)**

3        180.    Defendants have entered into an unlawful agreement in restraint of trade in

4    violation of MISS. CODE ANN. §75-21-1 *et seq*.  *See* Miss. Code Ann. §75-57-63.  Defendants'

5    combinations or conspiracies had the following effects: (1) price competition for crude oil and

6    gasoline was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2)

7    gasoline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

8    the State of Mississippi.  During the Class Period, Defendants' illegal conduct substantially

9    affected the State of Mississippi commerce.  Accordingly, Plaintiffs and members of the Class

10   seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-57-

11   63.

12

**COUNTS 27 & 28: NEBRASKA**
**(On Behalf of Class Members that Purchased Gasoline in Nebraska)**

13

14       181.    Defendants' combinations or conspiracies had the following effects: (1) price

15   competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the

16   State of Nebraska, and (2) gasoline prices were raised, fixed, maintained, and stabilized at

17   artificially high levels throughout the State of Nebraska.  During the Class Period, Defendants'

18   illegal conduct substantially affected the State of Nebraska commerce.

19       182.    Defendants restrained trade and commerce in the State of Nebraska by entering

20   into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*.  Accordingly,

21   Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et*

22   *seq*.

23       183.    Defendants have engaged in unfair competition or unfair or deceptive acts or

24   practices in violation of Neb. Rev. Stat. §59-1601 *et seq*., and, accordingly, Plaintiffs and members

25   of the Class seek all relief available under that statute.

26

27

28

**COUNTS 29 & 30: NEVADA**
**(On Behalf of Class Members that Purchased Gasoline in Nevada)**

184.     Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Nevada; (2) gasoline prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

185.     Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of Nevada.  As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq.*  Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

186.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 31 & 32: NEW HAMPSHIRE**
**(On Behalf of Class Members that Purchased Gasoline in New Hampshire)**

187.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil and gasoline market by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline prices in the State of New Hampshire at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

188.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

189.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

1
2

**<u>COUNTS 33 & 34: NEW MEXICO</u>**
**(On Behalf of Class Members that Purchased Gasoline in New Mexico)**

3      190.    Defendants' combinations or conspiracies detrimentally affected the price

4   competition in the State of New Mexico for crude oil and gasoline by restraining, suppressing,

5   and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained,

6   and stabilized gasoline prices in the State of New Mexico at artificially high levels.  During the

7   Class Period, Defendants' illegal conduct substantially affected commerce in the State of New

8   Mexico.

9      191.    Defendants violated the N.M. STAT. ANN. §57-1-1 *et seq.*, by entering into unlawful

10   agreement in restraint of trade in the State of New Mexico.  Accordingly, Plaintiffs and Members

11   of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

12      192.    Defendants have engaged in unfair competition or unfair or deceptive acts or

13   practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.*, and, accordingly, Plaintiffs and

14   members of the Class seek all relief available under that statute.

15
16

**<u>COUNT 35: NEW YORK</u>**
**(On Behalf of Class Members that Purchased Gasoline in New York)**

17      193.    Defendants have entered into an unlawful agreement in restraint of trade in

18   violation of N.Y. GEN. BUS. LAW §340 *et seq.*  Defendants' combinations or conspiracies had the

19   following effects: (1) price competition in the market for crude oil and gasoline was restrained,

20   suppressed, and eliminated throughout the State of New York, and (2) gasoline prices were raised,

21   fixed, maintained, and stabilized at artificially high levels throughout the State of New York.

22   During the Class Period, Defendants' illegal conduct substantially affected the State of New York

23   commerce.  The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS.

24   LAW §340 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under

25   N.Y. GEN. BUS. LAW §340 *et seq.*

26
27
28

**COUNT 36: NORTH CAROLINA**
**(On Behalf of Class Members that Purchased Gasoline in North Carolina)**

194.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) gasoline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce.  Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq*.

**COUNT 37: NORTH DAKOTA**
**(On Behalf of Class Members that Purchased Gasoline in North Dakota)**

195.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq*. through their anticompetitive actions.  Through their actions and actions of co-conspirators, gasoline prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the market for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of North Dakota.  Plaintiffs and members of the Class, including those who resided in the State of North Dakota and purchased gasoline there, paid supracompetitive, artificially inflated prices.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

**COUNTS 38 & 39: OREGON**
**(On Behalf of Class Members that Purchased Gasoline in Oregon)**

196.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Oregon; (2) gasoline prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open

competition.  During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

197.    Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq*.

198.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 40 & 41: RHODE ISLAND
### (On Behalf of Class Members that Purchased Gasoline in Rhode Island)

199.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for crude oil and gasoline market by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq*.  Accordingly, Plaintiffs and Members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

201.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 42 & 43: SOUTH DAKOTA
### (On Behalf of Class Members that Purchased Gasoline in South Dakota)

202.    Through their actions and actions of co-conspirators, gasoline prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the market for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of South

Dakota.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota.  Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased gasoline there, paid supracompetitive, artificially inflated prices for their gasoline.

203.  Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq*., through their anticompetitive actions.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

204.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 44: TENNESSEE**
**(On Behalf of Class Members that Purchased Gasoline in California)**

205.  Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of gasoline, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for gasoline, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

**COUNT 45: UTAH**
**(On Behalf of Class Members that Purchased Gasoline in Utah)**

206.  Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah.  Specifically, Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for crude oil and gasoline market by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline prices in Utah at

artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.  Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

### COUNT 46: VERMONT
**(On Behalf of Class Members that Purchased Gasoline in Vermont)**

207.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Vermont; (2) gasoline prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and the Class of all others so similarly situated, respectfully requests that:

A.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

B.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or

renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

        D.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

        E.     The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X.  JURY TRIAL DEMANDED

Plaintiffs demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: January 12, 2024

*/s/ Christopher A. Turtzo*
Christopher A. Turtzo; NV Bar No. 10253
**MORRIS, SULLIVAN & LEMKUL, LLP**
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Tel: (702) 405-8100
Fax: (702) 405-8101
turtzo@morrissullivanlaw.com

*Local Counsel for Plaintiffs*

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Patrick J. Coughlin
Carmen Medici
Fatima Brizuela
Daniel J. Brockwell
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4655
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com
dbrockwell@scott-scott.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Patrick McGahan
Michael Srodoski
Isabella De Lisi
Zachary Kranc
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
idelisi@scott-scott.com
zkranc@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Patrick Rodriguez
230 Park Ave., 17th Floor
New York, NY 11069
Tel: (212) 223-6444
prodriguez@scott-scott.com

*Counsel for Plaintiffs*