# EXHIBIT 3

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

Commissioners:   Lina M. Khan, Chair
                             Rebecca Kelly Slaughter
                             Alvaro M. Bedoya
                             Melissa Holyoak
                             Andrew Ferguson

| In the Matter of | |
|---|---|
| **Exxon Mobil Corporation,** <br>    a corporation. | **Docket No.** \_\_\_\_\_ <br><br> **PUBLIC VERSION** |

## COMPLAINT

      Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Exxon Mobil Corporation ("Exxon") has executed an Agreement and Plan of Merger (the "Merger Agreement") to acquire Pioneer Natural Resources Company ("Pioneer"), with Exxon remaining the surviving entity (the "Proposed Acquisition") in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, and Section 5 of the FTC Act, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

## NATURE OF THE CASE

      1.     Through public statements and private communications, Pioneer founder and former CEO Scott D. Sheffield has campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ("OPEC"), and a related cartel of other oil-producing countries known as OPEC+. Mr. Sheffield's communications were designed to pad Pioneer's bottom line—as well as those of oil companies in OPEC and OPEC+ member states—at the expense of U.S. households and businesses.

      2.     As part of its proposed acquisition of Pioneer, Exxon agreed to "take all necessary actions to cause Scott D. Sheffield … to be appointed to the board of directors" of Exxon ("Appointment Clause") after the Proposed Acquisition closes. By giving Mr. Sheffield a larger platform from which to pursue his anticompetitive schemes—as well as decision-making input and access to competitively sensitive information of Exxon—the Proposed Acquisition violates Section 7 of the Clayton Act because it would meaningfully increase the likelihood of

coordination, and thereby harm competition, in the market for development, production, and sale of crude oil. Increases in crude oil prices are passed on to Americans through higher gasoline, diesel, heating oil, and jet fuel prices.

3. OPEC and OPEC+ are cartels that exist to control global crude oil production and reserves. A potential constraint on the cartel's ability to curtail production and increase crude oil prices globally is production from the United States, and in particular from the Permian Basin in West Texas and New Mexico, where Pioneer operates as the largest crude oil producer. But rather than seeking to compete against OPEC and OPEC+ through independent competitive decision-making, Mr. Sheffield's goal in recent years at Pioneer has been to align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power.

4. Mr. Sheffield has not been shy about those goals, and has instead publicly told competitors that they should be "disciplined" about capacity growth and "stay[] in line." He further threatened: "All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."

5. But Mr. Sheffield did not limit himself to public signaling to U.S. counterparts—he has also held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low. For example, Mr. Sheffield messaged on WhatsApp to ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

6. This was not a one-off event but rather part of Mr. Sheffield's sustained and long-running strategy to coordinate output reductions—Mr. Sheffield has over the past several years held repeated in-person meetings and other discussions with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. For example, Mr. Sheffield has exchanged a series of text messages with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, discussing crude oil market dynamics, pricing, and output.

7. Under the 2023 U.S. Department of Justice and FTC Merger Guidelines (hereinafter, the "2023 Merger Guidelines"), "[a] merger may substantially lessen competition when it meaningfully increases the risk of coordination among the remaining firms in a relevant market or makes existing coordination more stable or effective." That is exactly what the Proposed Acquisition would do. By giving Mr. Sheffield a larger and more powerful platform—as well as decision-making influence over and access to competitively sensitive information of the largest multinational supermajor oil company and the largest producer in the Permian Basin—the Proposed Acquisition would increase the likelihood of anticompetitive coordination amongst crude oil producers and likely make existing coordination more effective.

8. The Proposed Acquisition accordingly violates Section 7 of the Clayton Act because it would meaningfully increase the likelihood of industry coordination to artificially reduce growth in the development, production, and sale of crude oil. Crude oil makes up the largest cost of transportation fuels. Increases in crude oil prices will lead Americans to pay

higher gasoline and diesel fuel prices at the pump and bear the burden of greater heating oil and jet fuel costs.

9. Mr. Sheffield's appointment to the Exxon Board would violate the antitrust laws for a second, independent reason. Mr. Sheffield currently serves on the Board of The Williams Companies, Inc. ("Williams"), which operates a host of natural gas pipelines; natural gas gathering, processing, and treating assets; natural gas and natural gas liquids processing assets; crude oil transportation assets; and crude oil and natural gas production. Exxon and Williams are competitors of each other. As such, appointing Mr. Sheffield to the Exxon Board would facilitate a board interlock among competitors in violation of Section 5 of the FTC Act.

### THE RESPONDENT

10. Respondent Exxon is a public, multi-national, vertically integrated oil and gas producer and refiner with operations in the United States and worldwide. It is headquartered in Spring, Texas. Exxon operates refineries throughout the world that produce transportation fuels and petrochemicals.

11. Respondent is, and at all relevant times relevant herein has been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

12. The Proposed Acquisition constitutes a merger subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

### THE ACQUIRED COMPANY

13. Pioneer is a public, independent oil and natural gas company headquartered in Irving, Texas. It produces crude oil and associated natural gas in the Permian Basin.

14. Pioneer is, and at all relevant times relevant herein has been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

### THE PROPOSED ACQUISITION

15. On October 10, 2023, Exxon and Pioneer entered into a Merger Agreement, whereby Exxon agreed to acquire Pioneer for an enterprise value of approximately $64.5 billion. Section 8.12 of the Merger Agreement contains the Appointment Clause.

### THE RELEVANT ANTITRUST MARKET

16. A relevant product market in which to assess the Proposed Acquisition's anticompetitive effects is the development, production, and sale of crude oil. Crude oil is the main input to produce gasoline, diesel fuel, heating oil, and jet fuel. Crude oil purchasers generally cannot switch to alternative commodities without facing substantial costs.

17. A relevant geographic market in which to analyze the Proposed Acquisition is global.

## **THE PROPOSED ACQUISITION MEANINGFULLY INCREASES THE RISK OF COORDINATION**

18. The Proposed Acquisition may substantially lessen competition by increasing the risk of coordination in the relevant market. The 2023 Merger Guidelines identify three primary factors that indicate a merger may increase the risk of coordination, including the existence of prior actual or attempted attempts to coordinate in the market. If any of the three primary factors are met, the Agencies "may conclude that post-merger market conditions are susceptible to coordinated interaction and that the merger materially increases the risk of coordination."

19. Mr. Sheffield's history of attempting to coordinate with other oil industry participants suggests that the market here is susceptible to anticompetitive coordination—a risk the Proposed Acquisition would only heighten. By installing Mr. Sheffield on Exxon's Board, the Proposed Acquisition risks amplifying his public messaging and the effectiveness of his private contacts with OPEC, thereby meaningfully increasing the likelihood of coordination in the relevant market.

20. OPEC was created in 1960 with the stated purpose to "coordinate and unify the petroleum policies of its Member Countries and ensure the stabilization of oil markets." OPEC has twelve member nations: Saudi Arabia, Iran, Iraq, Kuwait, Venezuela, Indonesia, Libya, UAE, Algeria, Nigeria, Equatorial Guinea, and Congo. Ten additional countries—including Russia—affiliated with OPEC in 2016 to create what is now known as OPEC+.

21. OPEC and OPEC+ countries agree on crude oil production levels at a country-level basis to coordinate and limit their collective output. OPEC and OPEC+ account for over 50% of global crude oil production. The fact that a cartel controls the majority of global output, in and of itself, suggests that the relevant market may be susceptible to coordination.

### A.  **Sheffield Has Attempted to Coordinate with Producers and OPEC Countries in an Effort to Cut Production in the Permian Basin**

22. There is voluminous evidence, including from Mr. Sheffield's own public statements, of his previous efforts to organize tacit (and potentially express) coordination of capital investment discipline and oil production levels in the Permian Basin and across the United States. Much of this coordination has been with high-ranking OPEC representatives, thus indicating that firms with a substantial share of the relevant market have engaged in this conduct. Moreover, regardless of whether these efforts at coordination were successful, the attempts alone suggest that Mr. Sheffield's appointment to the Exxon Board may make successful coordination more likely in the future.

23. A potential constraint on OPEC and OPEC+ is United States crude oil production. The United States for the past six years in a row has produced more crude oil than any nation ever, including in 2023, when U.S. production averaged 12.9 million barrels per day—a level

that broke the previous record for output by a single nation, per the U.S. Energy Information Administration.

24. This staggering growth in United States output is largely the result of production increases from the Permian Basin. In fact, a recent analyst report found that the United States has driven all the growth in oil supply over the past decade, and the Permian Basin has driven all growth in U.S. crude supply since early 2020.

25. U.S. production growth has injected new competition into the market and ultimately saved American consumers and businesses at the pump. But it has also frustrated OPEC representatives, Wall Street investors, and some shale executives themselves, who view this expanded production as lowering prices below the artificially high prices the OPEC cartel seeks to set and impose. "We produced too much oil and competed with OPEC," said Mr. Sheffield in 2023 remarks, discussing the history of U.S. shale operators. "We actually lowered the price by $20 to $30 per barrel over the past 10 years to the detriment of losing our entire investor base."

26. OPEC representatives and Mr. Sheffield responded to this new competitive dynamic by resorting to a classic tactic to tame the competition: embark on a series of efforts to coordinate output levels to keep production artificially low.

### *Sheffield Has Used Public Statements to Organize Tacit and Potentially Express Coordination*

27. One move in Mr. Sheffield's playbook has involved publicly threatening U.S. shale producers who might deviate from a coordinated output reduction scheme. For example, in 2021, Mr. Sheffield said "Everybody's going to be disciplined, regardless of whether it's $75 Brent, $80 Brent, or $100 Brent." He added that "All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."

28. In follow-on remarks seemingly targeting producers who might make independent production decisions, Mr. Sheffield tried to downplay the possibility that U.S. production would serve as a potential constraint on OPEC. "I don't think the world can rely much on US shale," he said. "It's really under OPEC control."

29. In a 2022 interview, Mr. Sheffield commented, "[i]n regard to the industry, it's been interesting watching some of the announcements so far, the public independents are staying in line . . . I'm confident they will continue to stay in line."

30. In fact, as recently as April 16, 2024, Mr. Sheffield said at a conference: "Even if oil gets to $200/bl, the independent producers are going to be disciplined."

31. And it is not just public statements. In 2020, Mr. Sheffield lobbied The Railroad Commission of Texas (RRC) to impose output restrictions on Permian oil production at the outset of the Covid pandemic. Mr. Sheffield was the leader of the movement advocating RRC-mandated production cuts, which would have reduced output and increased crude oil prices above market levels. ███████████████████████████████████████████ Mr.

Sheffield texted a group including other senior Pioneer executives, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

32. In discussing his efforts to coordinate the Texas producers under a mandated RRC production cut, Mr. Sheffield said "If Texas leads the way, maybe we can get OPEC to cut production. Maybe Saudi and Russia will follow. That was our plan." He added: "I was using the tactics of OPEC+ to get a bigger OPEC+ done."

33. That Mr. Sheffield would attempt to replicate OPEC's tactics is unsurprising, given his publicly-stated alignment with the cartel. "I've followed OPEC closer than almost any CEO in the history of our industry," he said in 2023.

### *Sheffield Has Communicated Privately and Directly with OPEC Representatives About Oil Prices and Curtailing Oil Production*

34. But Mr. Sheffield does not simply follow OPEC from afar. Instead, he is in close contact with top OPEC member state oil ministers and other high-ranking officials representing the cartel, and uses these relationships to encourage OPEC production controls and to discuss U.S. producers' efforts to maintain capital discipline in order to increase Pioneer's profits.

35. In March 2017, then-OPEC General Secretary Mohammed Barkindo organized a private dinner for U.S. shale producers, including Mr. Sheffield. Mr. Sheffield commented at the time, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US independents than I have seen over my entire career."

36. Indeed, recognizing the growing influence of shale production on global oil prices OPEC began reaching out and spending more time with one specific U.S. independent—Pioneer. Mr. Sheffield not only directly communicated with high-ranking OPEC officials ▮▮▮▮▮▮



37. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38. The close communications with high-ranking OPEC officials continued during the early days of the COVID pandemic, and focused on Mr. Sheffield's efforts to limit Permian oil production in the face of falling oil prices globally. ▮▮▮▮▮▮▮▮▮▮



39. Mr. Sheffield did, in fact, stay in regular contact with ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40. Through these regular contacts, Mr. Sheffield learned about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

41. Mr. Sheffield has not only exchanged information on oil pricing and output with OPEC representatives, but has also served as a conduit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

42. Mr. Sheffield also worked to facilitate direct communications between his competitors in the Permian Basin and OPEC. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

43. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

44. Mr. Sheffield's post-merger appointment to Exxon's Board would give him a larger platform from which to advocate for greater industry-wide coordination as well as decision-making input on not only the largest producer in the Permian Basin, but also the largest multinational supermajor oil company. This merger-specific enhancement of Mr. Sheffield's power and authority may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## UNFAIR METHOD OF COMPETITION

45. Mr. Sheffield currently serves on the Board of Williams, which operates a host of natural gas pipelines; natural gas gathering, processing, and treating assets; natural gas and natural gas liquids processing assets; crude oil transportation assets; and crude oil and natural gas production. Exxon and Williams are competitors of each other.

46. The Merger Agreement would enable Mr. Sheffield's appointment to Exxon's Board of Directors while simultaneously serving as director on Williams Board. Because the Proposed Acquisition would facilitate a board interlock among competitors, the Proposed Acquisition also violates Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.

## VIOLATIONS CHARGED

47. The Proposed Acquisition, if consummated, may substantially lessen competition, or tend to create a monopoly, in the relevant antitrust market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

48. The Merger Agreement between Exxon and Pioneer constitutes a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

49. The Proposed Acquisition constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**IN WITNESS WHEREOF,** the Federal Trade Commission, having caused this Complaint to be signed by the Secretary and its official seal affixed, at Washington, D.C., this _____ day of [month], 2024, issues its Complaint against said Respondent.

By the Commission.